# EXHIBIT A

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/06/2020 02:18 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez, Deputy Clerk
20STCV29806

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Monica Bachner

1   STEVEN I HOCHFELSEN, Bar No. 129491
    DAVID W. KANI, Bar No. 243032
2   **HOCHFELSEN & KANI, LLP**
    895 Dove St., Suite 300
3   Newport Beach, California 92660
    Telephone: (714) 907-0697
4

5   Attorneys for Plaintiffs
    ZIP MEDICAL BILLING, LLC,
6   SIGNAL GENOMICS, LLC, &
    SIGNAL DIAGNOSTICS, LLC
7

8
                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9
                              **COUNTY OF LOS ANGELES**
10

11  ZIP MEDICAL BILLING, LLC, a Delaware          **20STCV29806**
    Limited Liability Company; SIGNAL
12  GENOMICS, LLC, a Delaware Limited             **COMPLAINT FOR DAMAGES**
    Liability Company; SIGNAL
13  DIAGNOSTICS, LLC, a Delaware Limited          1.  **Breach of Contract**
    Liability Company;
14                                                2.  **Intentional Misrepresentation**

15                  Plaintiff,                    3.  **Negligent Misrepresentation**

16  vs.                                           4.  **Breach of Contract**

17  ARK LABORATORY, LLC dba HELIX                 5.  **Intentional Misrepresentation**
    DIAGNOSTICS, a Michigan Limited
18  Liability Company; HAMID SATTAR, an           6.  **Negligent Misrepresentation**
    individual; BRIAN TIERNEY, an individual;
19  JAMES GROSSI, an individual; NORMAN           7.  **Breach of Contract**
    KIMINAIA, an individual; JAMES BERG, an
20  individual, and DOES 1 through 100            8.  **Fraudulent Inducement**

21                                                9.  **Conspiracy to Defraud**

22                  Defendants.

23

24      Plaintiffs ZIP MEDICAL BILLING, LLC, a Delaware limited liability company ("Zip

25  Medical"); SIGNAL GENOMICS, LLC, a Delaware limited liability company ("Signal

26  Genomics"); SIGNAL DIAGNOSTICS, LLC, a Delaware limited liability company ("Signal

27  Diagnostics"), complain against ARK LABORATORY dba HELIX DIAGNOSTICS, a

28  Michigan Limited Liability Company ("hereinafter Ark Labs" or "Defendant"), as follows:

                                    – 1 –

                                 **COMPLAINT**

**PARTIES**

1.     Plaintiff Zip Medical is a Delaware limited liability company with its principal place of business is Los Angeles, California.

2.     Plaintiff Signal Genomics is a Delaware limited liability company with its principal place of business is Los Angeles, California.

3.     Plaintiff Signal Diagnostics is a Delaware limited liability company with its principal place of business is Los Angeles, California.

4.     Plaintiffs are informed and believe that defendant Ark Labs is a Michigan limited liability company which conducts business within the state of California.

5.     Plaintiffs are informed and believe that defendant Hamid Sattar ("Sattar") is, and at all relevant times, was an individual residing in the state of Michigan and at all relevant times served as the Medicare Authorized Official for Ark Labs.

6.     Plaintiffs are informed and believe that defendant James Grossi ("Grossi") is, and at all relevant times was, an individual residing in the state of Michigan and at all relevant times served as the Chief Executive Officer of Ark Labs.

7.     Plaintiffs are informed and believe that defendant James Berg ("Berg") is, and at all relevant times was, an individual residing in the state of Michigan and at all relevant times served as the Vice President of Ark Labs.

8.     Plaintiffs are informed and believe that defendant Norman Brian Tierney ("Tierney") is, and at all relevant times was, an individual residing in the state of Michigan and at all relevant times served as the President of Ark Labs.

9.     Plaintiffs are informed and believe that defendant Norman Kiminaia ("Kiminaia") is, and at all relevant times was, an individual residing in the state of Michigan and at all relevant times served as the Chief Financial Officer of Ark Labs.

10.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1-100 INCLUSIVE and, therefore, sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

– 2 –

**COMPLAINT**

1   Defendants are responsible in some manner for the injuries alleged herein, and that such injuries

2   as herein alleged were proximately caused by such Defendants.

3        11.   Plaintiffs are informed and believe, and thereon allege, that at all times herein

4   mentioned, Ark Labs, Sattar, Grossi, Tierney, Kiminaia, Berg and DOES 1 through 100

5   (collectively, "Ark Labs" or "Defendants"), were the agents, employees, partners, joint

6   venturers, successors or predecessors in interest, owners, principals, and employers of the

7   remaining Defendants, and by committing the acts hereinafter alleged, acted within the scope of

8   such agency, partnership, employment, ownership, or joint venture.   Plaintiffs are further

9   informed and believe, and based thereon allege, that the acts and/or omissions of each

10  Defendant was known by, authorized by, and/ or ratified by the other Defendants.

11       12.   Whenever in this complaint an act or omission of a corporation or other business

12  organization is alleged, the allegation shall be deemed to mean and to include an allegation that

13  the corporation or business organization acted or omitted to act through its agents.

14       13.   The California Superior Court has jurisdiction over this action pursuant to

15  California Constitution Article VI section 10, which grants the Superior Court "original

16  jurisdiction in all cases except those given by statute to other trial courts." No other basis of

17  jurisdiction is implied in this case.

18       14.   This Court is the proper venue for trial pursuant to California Code of Civil

19  Procedure section 395(a) because the events and injuries complaint of herein occurred in the

20  City and County of Los Angeles.

21                      **GENERAL ALLEGATIONS**

22  **A.   ZIP MEDICAL BILLING SERVICES AGREEMENT**

23       15.   On November 15, 2017, Zip Medical and Ark Labs entered into a Billing

24  Services Agreement ("Zip Billing Agreement") for a period of 12 months. The Zip Billing

25  Agreement included a clause which automatically renewed the agreement for an additional 12

26  months on November 15, 2018.   A true and correct copy of the Zip Billing Agreement is

27  attached hereto as **Exhibit A.**

28       16.   Pursuant to the Zip Billing Agreement, Ark Labs retained Zip Medical to provide

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

– 3 –

**COMPLAINT**

1 certain medical billing and payment collection services, and in return, Ark Labs authorized Zip
2 Medical to automatically debt Ark Labs' bank accounts for payment of its services on a
3 monthly basis.

4      17.     Ark Labs continuously and repeatedly failed to maintain sufficient funds in the
5 account which it had authorized Zip Medical to debit for payment of its services, and thus fell
6 behind in its payment obligations to Zip Medical.

7      18.     On November 15, 2018, the Zip Billing Agreement renewed on its own terms;
8 however, Ark Labs continued to fall further and further behind in payments with each passing
9 month.

10      19.     Since on or about March 2018, Ark Labs, by and through Grossi, its CEO,
11 repeatedly made false representations to Zip Medical and to plaintiff Signal Genomics, whom
12 Ark Labs had failed to pay pursuant to an agreement outlined herein below, that Ark Labs
13 would bring its accounts current. Instead Ark Labs made a number of partial and incomplete
14 payments periodically in order to continue to receive the benefits of Zip Medical and Signal
15 Genomics services under the false pretense that is would ultimately pay them what it owed.
16 Specifically, Grossi made the following statements to Zip Medical and to Signal Genomics
17 ("False Payment Promises"):

18      a.  March 9, 2018 – "Will do" in response to a delinquent payment demand.
19      b.  April 19, 2018 – "You will no doubt" in response to a delinquent payment
20        demand.
21      c.  December 21, 2018 – "You'll have [payment] Monday."
22      d.  January 3, 2019 – "Signal going out. Balance of Zip as well."
23      e.  January 4, 2019 – "…norm sent out the will be there…Norman sent the checks
24        they will to arrive tomorrow they're both cashable."
25      f.  January 5, 2019 – "Zip checks going out today will send tracking number."
26      g.  January 18, 2019 – "Checks going out."
27      h.  February 5, 2019 – "Norm sent hold for tracking."
28      i.  February 11, 2019 – "Norm sent."

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

-4-

COMPLAINT

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

1   j. February 14, 2019 – "[checks] Going out today."

2   k. February 21, 2019 – "You will get signal checks this week."

3   l. March 3, 2019 – "You will get [payment]."

4   m. March 5, 2019 – "Wired 10k today and will be wiring 5k every business day this

5    month to get you caught up by the end of the month…You will be caught up."

6   n. March 5, 2019 – In response to Ark Labs' bounced checks: "I was concerned

7    about that."

8   o. ~~March 17, 2019 – "Don't worry you will be paid 82k by months end."~~

9   p. March 20, 2019 – "More payments and Zip coming."

10   q. April 1, 2019 – "Will send [payment]."

11   r. April 9, 2019 – "Checks going out today."

12   s. April 10, 2019 – "You will be caught up by months end."

13   t. April 17, 2019 – "…I have the checkbook now that norm is gone. I'll confirm

14    sent if not will be sent by 11am via FedEx."

15   u. April 29, 2019 – "[payment] Going out today."

16  20. Zip Medical complied with its contractual obligations and continued to provide

17 Ark Labs with billing services pursuant to the Zip Billing Agreement based on Ark Labs'

18 repeated promises to bring its account current.

19  21. Zip Medical is informed and believes and thereon alleges that Ark Labs had no

20 intention of bringing its account current, rather, its promises to pay Zip Medical were only a

21 ruse to continue to receive the benefit of Zip Medical's services without paying for them until it

22 was able to complete its own in-house billing systems.

23  **B.** **SIGNAL GENOMICS SERVICES AGREEMENT**

24  22. On December 1, 2017, Ark Labs and Signal Genomics entered into a Services

25 Agreement ("Signal Genomics Services Agreement") for a period of 12 months. The Signal

26 Genomics Services Agreement automatically renewed on its own terms for an additional 12

27 months on December 1, 2018. A true and correct copy of the Signal Genomics Agreement is

28 attached hereto as **Exhibit B.**

-5-

**COMPLAINT**

23. Pursuant to the Signal Genomics Services Agreement, Signal Genomics was to provide Ark Labs with certain account management, records management, customer complaint management and operational assistance, among other things, and Ark Labs was to pay Signal Genomics $12,000.00 per week for such services.

24. Ark Labs breached the Signal Genomics Services Agreement by failing to comply with any of its payment obligations since on or about July 2018.

25. Since on or about March 2018, Ark Labs, by and through Grossi, its CEO, repeatedly made false representations to Signal Genomics that Ark Labs would bring its account current. Instead Ark Labs repeatedly made False Payment Promises in response to Signal Genomics' demands for payment in order to continue to receive the benefits of Signal Genomics' services under the false pretense that it would ultimately pay what it owned.

26. Signal Genomics complied with its contractual obligations under the services agreement and continued to provide Ark Labs with operational assistance based on Ark Labs' repeated promises to bring its account current.

27. Signal Genomics is informed and believes and thereon alleges that Ark Labs had no intention of bringing its account current, rather, its promises to pay Signal Genomics were only a ruse to continue to receive the benefit of Signal Genomics' services without paying for them. Ark Labs went so far as to send Signal Genomics pictures of checks that never arrived, fake FedEx tracking numbers and empty envelopes to continue to string Signal Genomics along on the promise that it would bring its account current.

28. Signal Genomics is informed and believes and thereon alleges that Ark Labs also breached the service agreement's anti-circumvention clause when it wrongfully contacted and solicited away one of Signal Genomics' clients.

**C. SIGNAL DIAGNOSTICS AGREEMENT**

29. On or about January 2019, Signal Diagnostics and Ark Labs entered into an agreement wherein Signal Diagnostics would provide certain laboratory and testing services for Ark Labs ("Signal Diagnostics Lab Agreement"). A true and correct copy of the Zip Billing Agreement is attached hereto as **Exhibit C**.

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

- 6 –

COMPLAINT

30.     Plaintiff Signal Diagnostics performed all its obligations pursuant to the Signal Diagnostics Lab Agreement, however Ark Labs has refused, and continues to refuse to pay Signal Diagnostics for its services.

31.     On or about April 19, 2019, and again on April 30, 2019, Ark Labs confirmed its payment obligation to Signal Diagnostics by and through its CEO, James Grossi who stated that "I'll pay your [Signal Diagnostics'] fees." However, he has failed and refused to make any such payment.

## ~~FIRST CAUSE OF ACTION~~

### For Breach of Contract

### (Zip Medical Against Ark Labs)

32.     Plaintiffs re-allege and incorporate by reference herein the allegations contained in the paragraphs above, as though fully set forth herein.

33.     On or about November 15, 2017, Zip Medical and Ark Labs entered into the Zip Billing Agreement pursuant to which Ark Labs retained Zip Medical to provide certain medical billing and payment collection services, and in return, Ark Labs authorized Zip Medical to automatically debt Ark Labs' bank accounts for payment of its services on a monthly basis. The agreement renewed on its own terms on November 15, 2018.

34.     Ark Labs fell behind in its payment obligations to Zip Medical by continuous and repeated failure to maintain sufficient funds in the account which it had authorized Zip Medical to debit for payment of its services.

35.     Zip Medical complied with its contractual obligations and continued to provide Ark Labs with billing services pursuant to the Zip Billing Agreement based on Ark Labs' repeated promises to brings its account current.

36.     Zip Medical is informed and believes and thereon alleges that Ark Labs had no intention of bringing its account current, rather, its promises to pay Zip Medical were only a ruse to continue to receive the benefit of Zip Medical's services without paying for them.

37.     Zip Medical performed all the promises, covenants, and conditions it agreed to perform in accordance with the Zip Billing Agreement, except for those promises, covenants

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

-7-

1  and conditions excused by the acts and omissions of Ark Labs.

2    38.   As a direct and proximate cause of Ark Labs' breach of the Zip Billing

3  Agreement, Zip Medical suffered substantial damages in excess of $575,000, the total of which

4  will be proven at trial.

5                           **SECOND CAUSE OF ACTION**

6                       **Fraud – Intentional Misrepresentation**

7                       **(Zip Medical Against Ark Labs and Grossi)**

8    39.   Plaintiffs re-allege and incorporate by reference herein the allegations contained

9  in the paragraphs above, as though fully set forth herein.

10    40.   Zip Medical is informed and believes, and thereon alleges, that on or about

11  March of 2018 and onward, Ark Labs and Grossi made the above False Payment Promises to

12  coax Zip Medical into continuing to provide its services to Ark Labs.

13    41.   Zip Medical is informed and believes, and thereon alleges, that each of the False

14  Payment Promises were intentional misrepresentations when made, or made with reckless

15  disregard for their truth, in order to coax Zip Medical into continuing to provide its services to

16  Ark Labs.

17    42.   Zip Medical is informed and believes, and thereon alleges, that defendants, and

18  each of them, knew each of the above False Payment Promises were false when made and made

19  these intentional misrepresentations with the intent to deceive and defraud Zip Medical, and to

20  induce Zip Medical to act in reliance on these intentional misrepresentation as alleged herein.

21    43.   Zip Medical was ignorant to the falsity of defendants' intentional

22  misrepresentations and believed them to be true and reasonably relied on such false statement to

23  its detriment.

24    44.   Zip Medical was harmed by defendants' intentional misrepresentations because

25  it would not have continued to provide its services to defendants had it known the truth as

26  alleged herein.

27    45.   As a direct and proximate cause of Ark Labs' intentional misrepresentations, Zip

28  Medical suffered substantial damages in excess of $575,000, the total of which will be proven at

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92560
Tel. (714) 907-0697

- 8 -

**COMPLAINT**

1  trial.

2      46.    Zip Medical is informed and believes, and thereon alleges, that defendants

3  intended to cause injury to Zip Medical or that their conduct was with willful and conscious

4  disregard to Zip Medical's rights, or subjected Zip Medical to unjust hardship so as to constitute

5  malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Zip

6  Medical to punitive damage in an amount appropriate to punish or to set an example of

7  defendants.

8  **THIRD CAUSE OF ACTION**

9  **Fraud – Negligent Misrepresentation**

10  **(Zip Medical Against Ark Labs and Grossi)**

11      47.    Plaintiffs re-allege and incorporate by reference herein the allegations contained

12  in the paragraphs above, as though fully set forth herein.

13      48.    Zip Medical is informed and believes, and thereon alleges, that on or about

14  March of 2018 and onward, Ark Labs and Grossi made the False Payment Promises to coax Zip

15  Medical into continuing to provide its services to Ark Labs.

16      49.    Zip Medical is informed and believes, and thereon alleges, that each of the False

17  Payment Promises were negligent misrepresentations when made in order to coax Zip Medical

18  into continuing to provide its services to Ark Labs.

19      50.    Zip Medical is informed and believes, and thereon alleges, that when defendants

20  made these negligent representations, they had no reasonable ground to believe that they were

21  true because the true facts were known to them.

22      51.    Zip Medical is informed and believes, and thereon alleges, that defendants, and

23  each of them, made these negligent misrepresentations with the intent to induce Zip Medical to

24  act in reliance on these negligent misrepresentation as alleged herein.

25      52.    Zip Medical reasonably relied on defendants' negligent misrepresentations to its

26  detriment.

27      53.    Zip Medical was harmed by defendants' negligent misrepresentations because it

28  would not have continued to provide its services to defendants had it known the truth as alleged

– 9 –

**COMPLAINT**

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

1    herein.

2        54.   As a direct and proximate cause of Ark Labs' negligent misrepresentations, Zip

3    Medical suffered substantial damages in excess of $575,000, the total of which will be proven at

4    trial.

5        55.   Zip Medical is informed and believes, and thereon alleges, that defendants

6    intended to cause injury to Zip Medical or that their conduct was with willful and conscious

7    disregard to Zip Medical's rights, or subjected Zip Medical to unjust hardship so as to constitute

8    malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Zip

9    Medical to punitive damage in an amount appropriate to punish or to set an example of

10   defendants.

**FOURTH CAUSE OF ACTION**

**Breach of Contract**

**(Signal Genomics Against Ark Labs)**

14       56.   Plaintiffs re-allege and incorporate by reference herein the allegations contained

15   in the paragraphs above, as though fully set forth herein.

16       57.   On December 1, 2017, Ark Labs and Signal Genomics entered into the Signal

17   Genomics Services Agreement pursuant to which Signal Genomics was to provide Ark Labs

18   with certain account management, records management, customer complaint management and

19   operational assistance, among other things, and Ark Labs was to pay Signal Genomics

20   $12,000.00 per week for such services.

21       58.   Ark Labs breached the Signal Genomics Services Agreement by failing to

22   comply with its payment obligations thereunder. Ark Labs fell behind in its payment obligations

23   to Signal Genomics by continuous and repeated failure to make timely payments as required by

24   the Signal Genomics Services Agreement.

25       59.   Signal Genomics has complied with its contractual obligations under the services

26   agreement and continued to provide Ark Labs with operational assistance based on Ark Labs

27   repeated promises to brings its account current.

28       60.   Signal Genomics performed all the promises, covenants, and conditions it agreed

– 10 –

**COMPLAINT**

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

1    to perform in accordance with the Signal Genomics Services Agreement, except for those

2    promises, covenants and conditions excused by the acts and omissions of Ark Labs.

3        61.    Signal Genomics is informed and believes and thereon alleges that Ark Labs had

4    no intention of bringing its account current, rather, its promises to pay Signal Genomics were

5    only a ruse, perpetuated by repeated false promises of payment by way of sending empty

6    envelopes, and false FedEx tracking numbers, to continue to receive the benefit of Signal

7    Genomics' services without paying for them.

8        62.    Signal Genomics is informed and believes and thereon alleges that Ark Labs also

9    breached the service agreement's anti-circumvention clause by wrongfully contacting and

10   soliciting at least one of Signal Genomics' clients.

11       63.    As a direct and proximate cause of Ark Labs' breach of the Signal Genomics

12   Services Agreement, Signal Genomics suffered substantial damages in excess of $600,000, the

13   total of which will be proven at trial.

14                          **FIFTH CAUSE OF ACTION**

15                      **Fraud – Intentional Misrepresentation**

16                   **(Signal Genomics Against Ark Labs and Grossi)**

17       64.    Plaintiffs re-allege and incorporate by reference herein the allegations contained

18   in the paragraphs above as though fully set forth herein.

19       65.    Signal Genomics is informed and believes, and thereon alleges, that on or about

20   March of 2018 and onward, Ark Labs and Grossi made the False Payment Promises to coax

21   Signal Genomics into continuing to provide its services to Ark Labs.

22       66.    Signal Genomics is informed and believes, and thereon alleges, that each of the

23   False Payment Promises were intentional misrepresentations when made, or made with reckless

24   disregard for their truth, in order to coax Signal Genomics into continuing to provide its services

25   to Ark Labs.

26       67.    Signal Genomics is informed and believes, and thereon alleges, that defendants,

27   and each of them, knew each of the above False Payment Promises were false when made and

28   made these intentional misrepresentations with the intent to deceive and defraud Signal

*HOCHFELSEN & KANI, LLP*
*895 Dove Street, Suite 300*
*Newport Beach, California 92660*
*Tel. (714) 907-0697*

- 11 –

**COMPLAINT**

Genomics, and to induce Signal Genomics to act in reliance on these intentional misrepresentation as alleged herein.

68.     Signal Genomics was ignorant to the falsity of defendants' intentional misrepresentations and believed them to be true and reasonably relied on such false statement to its detriment.

69.     Signal Genomics was harmed by defendants' intentional misrepresentations because it would not have continued to provide its services to defendants had it known the truth as alleged herein.

70.     As a direct and proximate cause of Ark Labs' intentional misrepresentation, Signal Genomics suffered substantial damages in excess of $600,000, the total of which will be proven at trial.

71.     Signal Genomics is informed and believes, and thereon alleges, that defendants intended to cause injury to Signal Genomics or that their conduct was with willful and conscious disregard to Signal Genomics' rights, or subjected Signal Genomics to unjust hardship so as to constitute malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Signal Genomics to punitive damage in an amount appropriate to punish or to set an example of defendants.

## SIXTH CAUSE OF ACTION

### Fraud – Negligent Misrepresentation

### (Signal Genomics Against Ark Labs and Grossi)

72.     Plaintiffs re-allege and incorporate by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

73.     Signal Genomics is informed and believes, and thereon alleges, that on or about March of 2018 and onward, Ark Labs and Grossi made the False Payment Promises to coax Signal Genomics into continuing to provide its services to Ark Labs.

74.     Signal Genomics is informed and believes, and thereon alleges, that each of the False Payment Promises were negligent misrepresentations when made to coax Signal Genomics into continuing to provide its services to Ark Labs.

- 12 –

COMPLAINT

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

75.     Signal Genomics is informed and believes, and thereon alleges, that when defendants made these negligent representations, they had no reasonable ground to believe that they were true because the true facts were known to them.

76.     Signal Genomics is informed and believes, and thereon alleges, that defendants, and each of them, made these negligent misrepresentations with the intent to induce Signal Genomics to act in reliance on these negligent misrepresentation as alleged herein.

77.     Signal Genomics reasonably relied on defendants' negligent misrepresentations to its detriment.

78.     Signal Genomics was harmed by defendants' negligent misrepresentations because it would not have continued to provide its services to defendants had it known the truth as alleged herein.

79.     As a direct and proximate cause of Ark Labs' negligent misrepresentation Signal Genomics suffered substantial damages in excess of $600,000, the total of which will be proven at trial.

80.     Signal Genomics is informed and believes, and thereon alleges, that defendants intended to cause injury to Signal Genomics or that their conduct was with willful and conscious disregard to Signal Genomics' rights, or subjected Signal Genomics to unjust hardship so as to constitute malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Signal Genomics to punitive damage in an amount appropriate to punish or to set an example of defendants.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

### (Signal Diagnostics Against Ark Labs)

81.     Plaintiffs re-allege and incorporate by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

82.     On or about January of 2019, Signal Diagnostics and Ark Labs entered into the Signal Diagnostics Agreement wherein Signal Diagnostics would provide certain laboratory and testing services for Ark Labs ("Signal Diagnostics Agreement").

– 13 –

**COMPLAINT**

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

83.     On or about April 19, 2019, and again on April 30, 2019, Ark Labs confirmed its payment obligation to Signal Diagnostics by and through its CEO, James Grossi, who stated that "I'll pay your [Signal Diagnostics'] fees".

84.     Signal Diagnostics performed all the promises, covenants, and conditions it agreed to perform in accordance with the Signal Diagnostics Services Agreement, except for those promises, covenants and conditions excused by the acts and omissions of Ark Labs.

85.     Ark Labs has refused and continues to refuse to pay Signal Diagnostics for its services.

86.     As the direct and proximate cause of Ark Labs' breach of the Signal Diagnostics Agreement, Signal Diagnostics suffered damages in excess of $10,000.00, the total of which will be proven at trial.

## EIGHTH CAUSE OF ACTION

### Fraud – Fraudulent Inducement

### (Signal Diagnostics Against Ark Labs and Grossi)

87.     Plaintiffs re-allege and incorporate by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

88.     On or about January 2019, Signal Diagnostics and Ark Labs entered into the Signal Diagnostics Agreement wherein Signal Diagnostics would provide certain laboratory and testing services for of Ark Labs ("Signal Diagnostics Agreement").

89.     Signal Diagnostics is informed and believes, and thereon alleges, that Ark Labs, by and through its CEO, Grossi, made intentionally false representations that it would pay Signal Diagnostics its reference fee in order to induce Signal Diagnostics into entering into the Signal Diagnostics Agreement.

90.     Signal Diagnostics is informed and believes, and thereon alleges, that at the time Ark Labs entered into the Signal Diagnostic Agreement, it had no intention of complying with the promises and representations of payment made in the agreement.

91.     Signal Diagnostics was unaware of Ark Lab's intent at the time it entered into the Signal Diagnostics Agreement.

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

- 14 -

92.   Ark Labs' misrepresentations were material in that, had Signal Diagnostics been aware for Ark Labs' true intent, it would not have entered into the Signal Diagnostics Agreement.

93.   Signal Genomics reasonably relied on such false statement to its detriment.

94.   Signal Diagnostics performed all conditions, covenants, and promises required of it under the agreement.

95.   Signal Diagnostics is informed and believes, and thereon alleges, that defendants, and each of them, knew each of the above statements were false when made and made these misrepresentations with the intent to deceive and defraud Signal Diagnostics, and to induce, and did in fact induce Signal Diagnostics to act in reliance on these false statements as alleged herein.

96.   As a direct and proximate cause of Ark Labs' fraudulent conduct, Signal Diagnostics suffered damages in excess of $10,000, the total of which will be proven at trial.

97.   Signal Diagnostics is informed and believes, and thereon alleges, that defendants intended to cause injury to Signal Diagnostics or that their conduct was with willful and conscious disregard to Signal Diagnostics' rights, or subjected Signal Diagnostics to unjust hardship so as to constitute malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Signal Diagnostics to punitive damage in an amount appropriate to punish or to set an example of defendants.

## NINTH CAUSE OF ACTION

### Conspiracy To Defraud

### (Zip Medical and Signal Genomics Against Grossi, Sattar, Tierney, Kiminaia, Berg)

98.   Plaintiffs re-allege and incorporate by reference herein the allegations contained in the paragraphs above as though fully set forth herein.

99.   Plaintiffs believe and thereon allege that defendants Grossi, Sattar, Tierney, Kiminaia, and Berg, and each of them (collectively referred to as the "Individual Defendants") entered into a mutual agreement to scheme to defraud Zip Medical and Signal Genomics by

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

- 15 –

1   way of extending repeated false payment promises in order to continue to receive benefits of

2   their services without having to pay for them.

3          100.    As a direct result of the conspiracy to defraud, described herein, Zip Medical and

4   Signal Genomics have sustained substantial damages in an amount to be proven at trial.

5          101.    As a direct result of the conspiracy to defraud, described herein, Zip Medical and

6   Signal Genomics are entitled to attorneys fees according to proof at trial.

7          102.    Zip Medical and Signal Genomics are informed and believe, and thereon allege,

8   that the Individual Defendants intended to cause them injury or that their conduct was with

9   willful and conscious disregard to their rights, or subjected them to unjust hardship so as to

10  constitute malice, oppression, or fraud under California Civil Code Section 3294, thereby

11  entitling them to punitive damage in an amount appropriate to punish or to set an example of the

12  Individual Defendants.

13

14                              **PRAYER FOR RELIEF**

15  Wherefore, Plaintiffs pray for a judgment against Ark Labs, as follows:

16  1.  For general damages according to proof at the time of trial;

17  2.  For damages in excess of $575,000 in connection with the breach of the Zip Billing

18      Agreement;

19  3.  For damages in excess of $600,000 in connection with the breach of the Signal

20      Genomics Services Agreement;

21  4.  For damages in excess of $10,000 in connection with the breach of the Signal

22      Diagnostics Agreement;

23  5.  For costs of suit;

24  6.  For prejudgment interest as allowed by law;

25  7.  For attorneys' fees; and

26  8.  For such and other further relief that the court deems just and proper.

27

28

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

COMPLAINT

HOCHFELSEN & KANI, LLP

Date: August 5, 2020

By:

David W. Kani, Esq.
Attorneys for Plaintiffs
ZIP MEDICAL BILLING, LLC,
SIGNAL GENOMICS, LLC, &
SIGNAL DIAGNOSTICS, LLC

HOCHFELSEN & KANI, LLP
895 Dove Street, Suite 300
Newport Beach, California 92660
Tel. (714) 907-0697

- 17 –

**COMPLAINT**

# EXHIBIT "A"

THIS BILLING SERVICES AGREEMENT ("the Agreement") is made and entered into as of _11/15_ , 2017 ("Effective Date") by and between ZIP Medical Billing LLC ("ZIP") and _Ark Labs_ ("Client").

Whereas, Client desires to engage ZIP to provide certain healthcare billing and related professional services as set forth in the attached schedule(s) and as amended from time to time by the mutual written consent of the parties; and

Whereas, ZIP desires to provide such services to Client in exchange for the payment of fees as set forth in the attached Schedule(s) and as amended from time to time by the mutual written consent of the parties;

NOW, THEREFORE, in consideration of mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## Terms

1.      *Term.* The initial term of this Agreement shall be for a period ("Initial Term") commencing on the Effective Date and ending on the last day of the calendar month in which the day before the first anniversary of the Effective Date shall fall. The Initial Term shall automatically be extended (any such extension being a "Renewal Term") for successive renewal periods of one (1) year each unless, at least 60 days prior to the date that the term of this Agreement would expire ("Scheduled Expiration Date"), either party gives written notice to the other party of the notifying party's election for the termination of this Agreement, in which event the term hereof shall expire on the Scheduled Expiration Date.  The Initial Term and any Renewal Terms are herein together referred to as the "Term" for purposes of this Agreement. Client understands that in the event Client terminates this Agreement prior to the expiration date of the Initial Term for any reason, all fees for the remainder of this Agreement shall become immediately due and payable to ZIP, which fees shall be calculated by multiplying the average fee for the previous three (3) months by the number of months remaining in the Initial Term.

2.      *ZIP Services.* Client herein engages ZIP to provide services as described in the Schedule(s) attached hereto and incorporated herein and ZIP agrees to provide such services pursuant to the terms of this Agreement.

The parties may amend the attached Schedule(s) from time to time upon mutual written consent.

2.1     *No Legal or Accounting Services Provided.*  By executing this Agreement, Client acknowledges its understanding that ZIP is not providing accounting or legal services hereunder, and shall not engage accounting or legal services on Client's behalf.  Client further acknowledges that ZIP shall only furnish services relating to the elections set out in Section 2.0 above.  Client remains solely responsible to retain and utilize appropriate legal and accounting assistance, as necessary, to make certain that its practices are in compliance with applicable statutes, rules and regulations governing Client.

2.2     *Assignment of Personnel.*  ZIP will act on Client's behalf relative to this Agreement and any other matters for which ZIP may be engaged.  ZIP shall assign sufficient personnel who ZIP believes have the requisite experience, skills and abilities to carry out ZIP's

obligations under this Agreement.

3.     *Service Fees*. Client agrees to pay the service fees to ZIP in the amounts provided for under the attached Schedule(s). Such service fees shall be invoiced in accordance with the attached Schedule(s). The fees are expressed a s a percentage of the total amount collected from all patients and all third party payors as a result of the billing services provided by ZIP, net of amounts refunded or credited to patients or third party payors as a result of (by way of example but not by way of limitation) overpayments, erroneous payments and bad checks.

4.     *Mutual Cooperation*. The parties acknowledge that the mutual cooperation of each party is critical to the ability of ZIP to successfully and efficiently perform its duties hereunder. Accordingly, each party agrees to fully cooperate with the other in formulating and implementing goals and objectives, which are in Client's best interest, within the parameters of this Agreement.

5.     *Ownership of Information; Confidentiality*.

5.1     *Ownership of Systems Generally*.     ZIP retains all ownership and other rights in all systems, manuals, computer software, materials, forms, templates, and all other information, in whatever form, provided or developed by ZIP in the performance of its obligations hereunder (hereinafter collectively referred to as "Systems"), and nothing contained in this Agreement shall be construed as a license or transfer of ownership of such Systems or any portion thereof to Client, either during the Term hereof or thereafter; provided, however, that ZIP hereby grants to Client a full-paid, non-sublicensable license of its billing software during the Term. Upon the termination or expiration of the Term, ZIP shall have the right to retain all such Systems.

5.2     *Certain Covenants Relative to the Systems*. Client acknowledges that ZIP has invested a significant amount of its resources in developing and maintaining the Systems and that the value of these Systems to ZIP may be diminished or destroyed if Client discloses information concerning the Systems or any portion thereof to a third party. Accordingly, Client agrees: (i) that it shall maintain the confidentiality of the Systems; (ii) that it shall not duplicate or permit the duplication of any portion of the Systems and shall not permit access to the Systems by Client's personnel or any third party other than on a "need-to-know" basis, and then only in the ordinary course of business and to individuals who have in writing acknowledged their obligation to maintain the confidentiality of systems and information provided to them by Client (which Client acknowledges includes the Systems); (iii) that it shall take at least those steps that it would take to protect its own confidential information; (iv) that it shall not loan, lease, or otherwise permit the use of any of the Systems to any other person or entity, regardless of its relationship to Client; and (v) that it shall notify ZIP of any suspected or actual breach of these confidentiality requirements. The parties agree that irreparable damage will result to ZIP and its business through Client's breach of the covenants set forth in this Section and that in the event of a breach or a threatened breach of the covenants set forth in this Section, in addition to monetary damages, ZIP shall be entitled to an injunction enjoining Client from further violation.

5.3     *Provisions Relative to Certain Information*. ZIP shall not act as a data

repository for information regarding Client and the other medical practices with which ZIP has entered into an agreement similar to this Agreement. All records relating in any way to the operation of Client which are not the property of Client, including data which is the product of ZIP's analysis of the records relating to Client and those relating to other medical practices, shall at all times be the property of ZIP. During the Term or after the termination or expiration of the Term ZIP will provide Client copies of any records relating to Client in a reasonable time frame. Upon the expiration or earlier termination of the Term, ZIP shall provide to Client all information about Client and its operations, including without limitation all information about its patients, services and payor agreements.

5.4 *Access to and Confidentiality of Certain Client Information.* During the Term, Client shall give ZIP access to Client, its facilities and its records. ZIP will maintain the confidentiality of patient records, Client charges, wages, marketing strategies, and other confidential information regarding Client, except to the extent that law requires disclosure. In the event that ZIP receives a subpoena of such information or the like it shall provide Client with immediate notice thereof and the opportunity to quash the subpoena or otherwise limit disclosure.

5.5 Notwithstanding anything to the contrary contained herein, ZIP and ZIP's affiliates may use PHI for operations, research, quality improvement and other purposes, all as authorized or consented to by individual patients or their representatives, and may use de-identified data for such purposes without the need for any such authorization or consent. Client shall provide all raw and analyzed data and other PHI regarding patients with respect to whom ZIP is billing patients or other payers for Client's services, via the HL7 interfaces and web services established by the parties or otherwise as agreed by the parties.

5.6 *Confidentiality of this Agreement.* Client and ZIP agree that the terms of this Agreement shall remain confidential. Neither Client nor ZIP shall distribute this Agreement to any third party unless required by law to do so.

5.7 *Survival.* All of the provisions of this Section shall survive termination or expiration of the Term.

6. *Licensing; Compliance with the Law.* Client shall take all steps necessary to maintain all licenses, permits and authorizations necessary to permit it to conduct its business. Client shall comply with all relevant laws, ordinances, rules, and regulations of state, local, or federal governments.

7. *Breach.* In the event of a breach of any obligation or covenant under this Agreement, other than the obligation to pay money, the non-breaching party must give the breaching party written notice of the specifics of the breach, and the breaching party shall have 30 days from receipt of written notification of claimed breach (the "Cure Period") in which to cure the breach (or, in the case of a breach not susceptible of cure within 30 days, to commence to cure and to prosecute such cure diligently to completion). If the breach is not cured within the Cure Period, the non-breaching party shall be entitled to pursue any and all remedies it may have by reason of the breach, including a termination of the Term hereof and the filing of a legal

action for monetary damages.  A waiver of any breach of this Agreement shall not constitute a waiver of any future breaches of this Agreement, whether of a similar or dissimilar nature.

8.   *Termination.*

In addition to termination upon breach rights set forth above:

     8.1   *Termination for Cause.* Client may terminate this Agreement under the following circumstances: (i) in the event ZIP misapplies funds or assets of Client, by giving thirty (30) days' advance written notice of termination, which shall not be effective if the breach is cured within the notice period; provided, however, that in the case of intentional or bad faith actions by ZIP, Client may terminate this Agreement by notice effective on such earlier date as Client may elect; (ii) in the event of a material breach of this Agreement by ZIP which is not cured within the Cure Period set forth in Section 7 above, or in the event of a breach as to which no Cure Period is provided by this Agreement, Client may terminate this Agreement upon no less than 30 days' notice; provided, however, that notice of termination must be given no later than 30 days after the expiration of the Cure Period if one is applicable; and provided, further, that notice of termination may be given simultaneously with the notice of breach initiating the Cure Period.  The remedy of termination shall be in addition to any other remedy available at law or in equity. Failure to terminate the Term hereof shall not waive any breach of this Agreement.

     8.2   *Termination Without Cause.* ZIP or Client (the "terminating party") may terminate this Agreement under the following circumstances: (i) in the event of the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors, or upon other action taken or suffered, voluntarily or involuntarily, under any federal or state law for the benefit of debtors by the other party, except for the filing of a petition in involuntary bankruptcy against such other party which is dismissed within thirty (30) days thereafter, the terminating party may give notice of the immediate termination of the Term hereof; (ii) in the event of a material breach of this Agreement by either party which is not cured within the Cure Period set forth in Section 7 hereinabove, or in the event of a breach as to which no Cure Period is provided by this Agreement, the other party (the terminating party) may terminate the Term hereof upon no less than 30 days' notice; provided, however, that notice of termination must be given no later than 30 days after the expiration of the Cure Period if one is applicable; (iii) in the event Client's Medicare or Medicaid number shall be terminated or suspended as a result of the action or inaction of Client or a physician employee, and such termination or suspension shall continue for thirty (30) days, ZIP may give notice of the immediate termination of this Agreement, unless Client shall at that time be acting in good faith (and shall provide reasonable evidence of the action being taken) to reverse such termination or suspension; provided, however, that notwithstanding any good faith effort on the part of Client to reverse such termination or suspension, if such termination or suspension shall not be reversed within ninety (90) days after occurrence, ZIP shall thereupon have the right to terminate this Agreement immediately by giving written notice to Client; (iv) ZIP may terminate this Agreement upon 30 days' written notice in the event any material license or certification required by Client to operate cannot be obtained or is suspended, terminated, or revoked; or (v) ZIP may terminate this Agreement upon 30 days written notice in the event Client fails to pay service fees as required by this Agreement. The remedy of termination shall be in addition to any other remedy available at law or in equity.

Failure to terminate this Agreement shall not waive any breach of this Agreement.

8.3    *No Data Storage.*  Client acknowledges that, upon the termination of this Agreement for any reason, it shall have the opportunity, for a limited time, per notice from ZIP, to download any and all data obtained or generated on behalf of Client. Thereafter, ZIP shall have no obligation to maintain or store Client's data.

9.    *Effects of Termination.*  The termination of the Term hereof for any reason shall be without prejudice to any payments or obligations, which may have accrued, or become due hereunder prior to the date of termination, which survive termination or which may become due after such termination.

10.    *Indemnification and Insurance.*

10.1    *Indemnification.*  Each party ("Indemnitor") shall defend, indemnify, and save the other party ("Indemnitee") harmless from and against any and all liability and expenses of any kind arising from claims by third parties in connection with the activities of Indemnitor, unless such liability resulted from the sole negligence of Indemnitee, from Indemnitee's conduct outside the scope of its authority under this Agreement or from Indemnitee's willful misconduct or gross negligence in the discharge of its obligations under this Agreement. Indemnitor shall be responsible for any losses or damages to Indemnitee or to any third parties arising from or relating to Indemnitor's discharge of its obligations pursuant to this Agreement, where such loss or damage is caused by the failure of Indemnitor to discharge its obligations hereunder in a timely, complete, accurate and professional manner. Notwithstanding anything to the contrary, Indemnitee will not seek to hold Indemnitor responsible for any failure of Indemnitor to discharge its obligations hereunder caused by circumstances beyond the control of Indemnitor including, without limitation, situations of national emergency, fire, flood, other catastrophes and acts of God, insurrection, war, riots, failures of transportation, interruption of communications or power supply, or mechanical difficulties with the computer equipment of Indemnitor not reasonably anticipatable and preventable by Indemnitor. In the event Indemnitor fails to timely and fully pay all amounts due relative to any claims for which Indemnitor is to indemnify Indemnitee hereunder, Indemnitee may elect to resolve such claim, and in said event, Indemnitee may recover from Indemnitor in addition to the amount so paid, plus interest on the amount claimed at a rate of 18% per annum, in addition to Indemnitee's reasonable attorneys' fees and legal costs in connection with the enforcement of this Agreement. The provisions of this Section shall survive termination or expiration of the Term hereof.

10.2    *Insurance.*  ZIP shall maintain in full force and effect at all times during the term of this Agreement, Workers' Compensation insurance covering all of its employees, as well as General Liability Insurance, and Errors and Omissions insurance (including without limitation cyberliability coverage) with a policy limit of no less than $1,000,000/$3,000,000. ZIP shall give Client timely notice of the cancellation or lapse of any of the above policies and ZIP agrees that such lapse or cancellation shall be deemed cause for termination of this Agreement.

11.    *Notices.*  All notices permitted or required by this Agreement shall be deemed

given when in writing and delivered personally or deposited in the United States mail, postage prepaid, return receipt requested, addressed to the other party at the street address and the email address set forth below or such other address as the party may designate in writing:

To ZIP:

_____
_____
_____
_____

To Client:        *Ark Laboratory LLC*
*6620 Highland Rd.*
*Ste 240*
*Waterford, M. 48327*

12.    *Confidentiality of Agreement.* In conjunction with the provisions of Section 6 hereinabove, ZIP and Client agree that the terms and conditions of this Agreement shall remain confidential. Neither ZIP nor Client shall distribute or disclose this Agreement, or any part thereof, to any third-party other than to business and professional advisors, on a need to know basis, unless required by law to do so.

13.    *Referrals.* Nothing in this Agreement or any consideration, whether written or oral, in connection herewith contemplates or requires the referral of any patient. This Agreement is not intended to influence the judgment of any professional choosing the medical facility appropriate for the proper treatment and care of his or her patients. The parties hereto support the patient's right to select the medical facility of his or her choice. The parties specifically do not intend to violate the federal (or any state's) Anti-Fraud and Abuse provisions [42 USC §1320a7b(b)]. The parties intend to comply with the Safe Harbor for Personal Service Agreements contained at 42 CFR §1001.952(d).

14.    *Compliance with Law.* In the event that any provision of this Agreement is not in material compliance with existing laws or regulations, either party may provide notice thereof to the other, and the parties shall meet within ten (10) business days to renegotiate the provisions of this Agreement for the purpose of making it legally compliant. If the parties fail to renegotiate the provisions of this Agreement to bring this Agreement into legal compliance, this Agreement shall terminate on the thirtieth (30th) day following the initial notice of proper determination of noncompliance.

15.    *Independent Relationship.* The parties intend that the relationship between them created by this Agreement is that of principal - independent contractor only. ZIP is not to be considered Client's agent or employee for any purpose. Further, notwithstanding the authority granted to ZIP herein, ZIP and Client agree that Client shall retain all authority to direct the operations of Client's clinical laboratory. Each party shall be solely responsible for and shall comply with all state and federal laws pertaining to employment taxes, income withholding, unemployment compensation contributions and other employment-related statutes applicable to that party.

16.     *Exclusive Provider*. Client hereby appoints ZIP as Client's sole and exclusive provider of the services herein described, including those services identified in the attached Schedules. If Client has any items/clients/services that require a "carveout" Client will specify the same in writing to ZIP and no such carveout shall take effect until acknowledged by ZIP. Client shall not take control of and/or perform those services provided by ZIP under this Agreement during the Term hereof.

17.     *Government Access to Records*. To the extent required by Section 1861 (v)(1)(l) of the Social Security Act, each party shall, upon proper request, allow the United States Department of Health and Human Services, the Comptroller General of the United States, and their duly authorized representatives access to this Agreement and to all books, documents, and records necessary to verify the nature and extent of the costs of services provided by either party under this Agreement, at any time during the term of this Agreement and for an additional period of four (4) years following the last date that services are furnished under this Agreement. If either party carries out any of its duties under this Agreement through an Agreement between it and an individual or organization related to it or through a subcontract with an unrelated party, such party to this Agreement shall require that a clause be included in such Agreement to the effect that until the expiration of four (4) years after the furnishing of services pursuant to such Agreement, the related organization shall make available, upon request by the United States Department of Health and Human Services, the Comptroller General of the United States, or any of their duly authorized representatives, all agreements, books, documents, and records of such related organization that are necessary to verify the nature and extent of the costs of services provided under that Agreement.

18.     *Fraud and Abuse*.  Each party agrees that it shall not engage in any activities which are prohibited by or are in violation of the rules, regulations, policies, contracts or laws pertaining to any third-party payor program, rules of professional conduct or applicable statute or regulation ("Applicable Rules and Regulations"), including, but not limited, to the following: (i) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (ii) knowingly and willfully making or causing to be made any false statement or presentation of a material fact for use in determining rights to any benefit or payment; (iii) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on Client's own behalf or on behalf of another, with intent to fraudulently secure such benefit or payment; or (iv) knowingly and willfully soliciting or receiving any remuneration (including any kickback or bribe), directly or indirectly in cash or in kind, or offering to pay or receive such remuneration, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in party by Medicare or Medicaid, in return for purchasing, leasing, or ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid.  The parties agree that their mutual indemnification includes indemnification with respect to claims related to fraud and abuse.

19.     *Business Associate Agreement*.  The parties shall enter into a separate Business Associate Agreement.

20. *Covenant Not to Solicit.* Client and ZIP each agrees that during the Term hereof and for a period of twelve months following the termination thereof, it shall not directly or indirectly employ or seek to employ any persons employed by either party, at any time during the term of the Agreement, to perform services for Client as an employee, independent contractor or otherwise, unless both parties so agree in writing.

21. *Miscellaneous.*

21.1 *Headings.* Section headings are for convenience of reference only and shall not be used to construe the meaning of any provision of this Agreement.

21.2 *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one Agreement. Should any part of this Agreement be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of the remaining provisions.

21.3 *Authority.* Each individual signing this Agreement warrants that the party for which he or she is signing has duly authorized such execution. All applicable laws and regulations and all necessary corporate action have duly authorized the execution and performance of this Agreement by each party, and this Agreement constitutes the valid and enforceable obligation of each party in accordance with its terms.

21.4 *Construction and Jurisdiction; Enforcement.* This Agreement shall be construed in accordance with the laws of the State of California. The parties hereby agree to use reasonable good faith efforts to resolve any dispute hereunder by promptly identifying a contact person and instructing such individual to negotiate in good faith with the other party's contact person to resolve any such dispute. With respect to any dispute not resolved within two months of identifying the relevant contact persons, the parties hereby agree to submit any unresolved dispute arising under this Agreement to mediation under the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Mediation. If any dispute is not resolved by mediation within six months of selection of a mediator, the dispute shall be submitted to arbitration in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration. The same person shall serve both as the mediator and as the arbitrator. A final arbitration award may be entered as a judgment in a court of competent jurisdiction. The parties hereto hereby consent to the exclusive jurisdiction and venue of the state and federal courts of Los Angeles County, California with respect to the resolution of any proceeding hereunder.

21.5 *Modification.* This Agreement may not be modified except by written agreement executed by both parties.

21.6 *Successors.* This Agreement and schedule(s) hereto shall be binding upon, and shall inure to the benefit of, the parties and their respective legal representatives, successors, and assigns.

21.7   *Assignment.*   Neither Client nor ZIP may assign this Agreement or any rights hereunder, nor may it delegate any of its duties to be performed hereunder, without the prior written consent of the other. Notwithstanding the foregoing, ZIP may assign this Agreement to an affiliate.

21.8   *Third Parties.* This Agreement is not intended, nor shall it be construed, to create any rights in any third parties.

21.9   *Entire Agreement.*   This Agreement constitutes the entire Agreement of the parties hereto and supersedes all prior agreements and representations with respect to the subject matter hereof.

*[Remainder of page intentionally left blank. Signatures appear on following page.]*

IN WITNESS WHEREOF ZIP and Client have entered into this Agreement as of the Effective Date.

ZIP:                                                   CLIENT:

ZIP Medical Billing LLC                   _____

a Delaware limited liability company   a _____  _____


By: _____           By: _____

   Alexander Meshkin, Manager              Name:                    Title:

Date signed:_____      Date signed: _____

## Schedule A -- Statement of Work

**Services** -- The Services are described in greater detail in Schedule B, attached hereto and incorporated herein by reference.

| Select: | Service | Rate |
|---------|---------|------|
| | Billing / Data Entry / Scrubbing | 6% of amount collected |
| *included* | *Credentialing* | |
| *included* | *Denial Management / Status / Appeals* | |
| *included* | *Billing software license with interface to LIS* | |
| *included* | *Reporting* | |
| | Logistics services (including accessioning, receiving and shipping, documentation resolution and cloud-based platform for specimen tracking and billing documentation) and Prior Authorization services (including filing a pre-verification/ pre-authorization on behalf of the patient with any commercial insurance company) | 4% of amount collected |
| *included* | Clients that contract for Logistics Services under a Billing Services Agreement may obtain access to the Flow Health Network, subject to all the terms and conditions of the Marketplace Participation Agreement. | |

*[handwritten: 8% / all / in / per / contracts / w/ / Flex]*

**Payment terms**

ZIP shall provide the Client with an invoice monthly during the Term on the 5th day of the month for services provided through the last day of the previous month. The monthly invoice shall be paid upon receipt of the monthly invoice. Payment shall be made by electronic funds transfer pursuant to the Automated Clearing House Agreement, in the form set forth in Schedule C, to be signed and delivered with this Agreement. In the event there are insufficient funds in Client's account following an initial debit attempt, ZIP will issue a written late payment notice and will charge Client a $50 late fee. In addition, any late payment will accrue interest at the rate of 1.5% per month (18% per annum) or the maximum amount allowed by law, if less,

*[Remainder of page intentionally left blank. Signatures appear on following page.]*

The terms and conditions of the **Billing Services Agreement** apply in full to the services and products provided under this Statement of Work.

**IN WITNESS WHEREOF**, the parties hereto each acting with proper authority have executed this Statement of Work.

ZIP:

ZIP Medical Billing LLC

CLIENT:

Authorized Agent

Name

Titel

Date signed

Authorized Agent

Name    James Grossi

Title    CEO

Date signed

11/15/17

**Schedule B**
**Detailed Statement of Work**

1. **Credentialing**

ZIP shall arrange for Client to be credentialed with the payors indicated by by Client from time to time.

ZIP warrants that it follows all regulatory and compliance standards related to the billing processes. ZIP agrees to provide resources for any review request or audits that may be requested by third party payers.

2. **Business Analytics and Reporting**

ZIP provides business analytics in additional reporting formats above and beyond normal billing system standards. Data elements included into this module include, but not limited to:

1) source of business analysis
2) "Days in A/R" by payer
3) Average reimbursement analysis

Additional data elements (when available) could include: reimbursement analysis, by payer, by region

3. **Billing / Data Entry / Scrubbing**

A. ZIP shall prepare, process and submit electronically on behalf of Client all claims for third party payment to commercial and government payors for services provided by Client to its patients, and shall collect payment for those claims. (Preparation shall include standard pre-billing data integrity validation -- including patient demographics as well as insurance verification and review for completeness and accuracy prior to submission of claims.) Without limiting the foregoing, ZIP shall obtain prior authorizations where required, and shall submit claims on behalf of and in the name of Client to Medicare, Medicaid, and all other payors. All such claims shall be submitted by ZIP in the Client's name and utilizing provider numbers assigned to the Client by the respective third party payor. Claims will be submitted in the manner directed by the third party payor. Client hereby expressly authorizes ZIP to submit claims on its behalf in accordance with this agreement. ZIP shall file secondary and tertiary claims where necessary to secure full payment of the amount owed to Client. ZIP shall rebill where reasonably necessary. Payment of all claims filed on behalf of Client shall be directed to such accounts as Client directs, and over which Client has sole control as may be required by Medicare and other third party payors.

Data entry is the actual process of entering claims into the billing software.

Data scrubbing is the process by which all pre-billing data is validated. Patient demographics and insurance verification and eligibility, are checked for completeness and accuracy (regardless of whether data is coming in electronically or manually through scanned requisitions).

### 4. Denial Management / Status / Appeals

ZIP will be responsible for responding to requests from payers that allows for adjudication of the billed claims. This process includes responding to all necessary additional information requests and pursuing all available appeals processes allowed by the payers.

### 5. Billing Software license with LIS interface

ZIP will provide authorized software license to client. Client has unlimited secure access to the software platform.

ZIP agrees to absorb interface costs incurred by billing software vendor for data download from Client's LIS system.

### 6. Logistics Services

| Logistics Services | Description |
|---|---|
| Cloud Services | The process of ZIP making its cloud-based platform (the "Platform") accessible by Client for purposes of (i) tracking specimens and (ii) preparing documents for billing of specimens.  Client may retrieve its data from the Platform through batch download functionality. ZIP may collaborate with the Client regarding additional integrations, which integrations (if any) will be set forth in a separate, written agreement between the Parties. |
| Accessioning Services | The process of ZIP (i) receiving the complete set of documentation reasonably required by ZIP regarding a specimen and (ii) entering such documentation into the Platform. |
| Receiving and Shipping Services | The process of ZIP receiving specimens at its premises from Client - or Client's  clients - sorting them (in accordance with decision rules provided by Client to ZIP in writing), and promptly shipping specimens to Client or to third parties in accordance with such decision rules. |

| Documentation Resolution Services | The process of ZIP, for each specimen lacking any documentation, (i) making commercially reasonable efforts consistent with industry standards to attempt to rectify the documentation by contacting the party that submitted the specimen and (ii) if such documentation is so rectified, re-entering the documentation into the Platform. |
| --- | --- |
| Prior Authorization | The process of ZIP facilitating pre-verification/pre-authorization on behalf of the patient with any commercial insurance company. |

**Schedule C**
**Automated Clearing House (ACH) Authorization Form**

As a Zip Medical Billing LLC client you agree to a monthly billing cycle. You will receive an invoice for the previous month of activity and fees for Zip services transacted which will be automatically debited via ACH from your business checking account.

The undersigned hereby authorizes Zip Medical Billing LLC, hereinafter called COMPANY, to initiate debit entries to its Checking Account / Savings Account (select one) at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account. The undersigned acknowledges that the origination of ACH transactions to its account must comply with the provisions of US law.

DEPOSITORY
Name _Clarkston State Bank_   Branch _Waterford_
City _Waterford Twp_   State _Mi_   Zip _48327_

The Bank Name
Bank Address

⑆ 123456789 ⑆  ⑈ 12 34567890 ⑈   101

**9 Digit Bank Routing Number    Your Account Number**

Routing Number ▮▮▮▮▮▮▮▮   Account Number ▮▮▮▮▮▮▮▮

This authorization is to remain in full force and effect until COMPANY has received written notification from the undersigned of its termination in such time and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

**Authorization**

CLIENT:

_Ark Laboratory LLC_

Name _James A. Grass_. Title _CEO_
(Please Print)

Signature _____   Date _11/15/17_

Attach Voided Business Check Below

FIRST AMENDMENT TO BILLING SERVICES AGREEMENT dated as of July 1, 2018 by and between Zip Medical Billing LLC ("Zip") and ARK Laboratory LLC dba Helix Diagnostics ("Client"), amending the Billing Services Agreement by and between the parties dated November 15, 2017 (the "Agreement").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Effective March 1, 2018 (i.e., for services provided from and after March 1, 2018, payable during April 2018), Schedule A of the Agreement is hereby deleted and replaced with the attached replacement Schedule A; provided, however, that the *rates* set forth *in italics* in the attached Schedule A shall not be effective until August 1, 2018.

2.      Capitalized terms not defined herein shall have the meanings given them in the Agreement.

3.      As amended hereby, the parties acknowledge and agree that the Agreement in the form dated as of November 15, 2017 remains in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives and to be effective as of the Effective Date.

ZIP MEDICAL BILLING LLC

By:      _____
         Alex Meshkin, Manager

ARK Laboratory LLC

By:      _____
         Jim Grossi, CEO

**Schedule A – Statement of Work**
**(First Amendment)**

**Services – The Services are described in greater detail in Schedule B, attached hereto and incorporated herein by reference.**

| Select: | Service | Rate |
|---|---|---|
| | Billing / Data Entry/ Scrubbing with respect to all tests billed in Client's name | *8% of amount collected for first $400,000 collected in a calendar month; plus* *7% of amount collected for the next $200,000 collected in a calendar month (i.e., $400,000.01 to $600,000); plus* *6% of amount collected in excess of $600,000 collected in a calendar month (i.e. $600,000.01 and up).* |
| *included* | *Credentialing* | |
| *included* | *Denial Management / Status / Appeals* | |
| *included* | *Billing software license with interface to LIS* | |
| *included* | *Reporting* | |

**Payment terms**

ZIP shall provide the Client with an invoice monthly during the Term on the 5th day of the month for services provided through the last day of the previous month.  An amount equal to one-half (½) of the service fee invoiced on the monthly invoice shall be paid upon receipt of the monthly invoice (i.e., on the fifth (5th) of the month) and an amount equal to one-half (½) of the service fee invoiced on the monthly invoice shall be paid on the fifteenth (15th) on the month (i.e., ten (10) days later). Payment shall be made by electronic funds transfer pursuant to the Automated Clearing House Agreement, in the form set forth in Schedule C, to be signed and delivered with this Agreement. In the event there are insufficient funds in Client's account following an initial debit attempt, ZIP will issue a written late payment notice and will charge Client, and Client will pay, a late fee equal to 5% of the late payment. In addition, any late payment will accrue interest at the rate of 1.5% per month (18% per annum) or the maximum amount allowed by law, if less.

EXHIBIT "B"

## SERVICES AGREEMENT

This Services Agreement, dated as of December 1, 2017 ("Effective Date"), by and between Ark Laboratory LLC, a Michigan limited liability company 6620 Highland Rd, Waterford Twp, MI 48327 ("Company"), and Signal Genomics a Delaware limited liability company with an address at 520 Broadway Santa Monica, CA 90401 ("Consultant").

## ARTICLE I
## SCOPE OF SERVICES

1.1 Company represents and warrants that it is operates a CLIA-approved clinical laboratory, licensed in all states where license is required in order to provide services in the Territory and that it shall maintain all required approvals and licenses throughout the Term hereof.

1.2 Company hereby engages Consultant, and Consultant accepts such engagement, to provide certain services to Company as set forth in the Statement of Work attached hereto as Schedule A ("Statement of Work"), which Schedule is hereby made a part of this Agreement and incorporated herein by reference. The services to be provided by Consultant as set forth in the Statement of Work are hereinafter referred to as the "Services."

1.3 Consultant shall faithfully perform and use its best efforts in performing the Services according to the requirements set forth in the Statement of Work.

1.4 Consultant shall determine the location and the means by and the manner in which the Services will be performed. Except as may be specifically otherwise agreed by Company, Consultant shall supply all equipment, tools, materials and/or supplies needed to accomplish the Services.

## ARTICLE II
## COMPENSATION

2.1 Company agrees to pay the fee to Consultant, as full and complete payment for Consultant's performance of the Services, as and when indicated on Schedule A, subject to the conditions in Article III.

2.2 The fee provided on Schedule A shall be Consultant's sole form of compensation paid by the Company for the Services.

2.3 Payment of the fee is acknowledged as the parties' negotiated agreement as to the reasonable fair market value of the Services furnished by Consultant pursuant to this Agreement considering the nature and volume of the Services. Company and Consultant recognize and acknowledge that (i) Consultant's consulting and administrative expertise shall contribute value to Company and the operation of Company, and (ii) Consultant will be expending efforts in providing the Services. It is the intent of the parties that the fee reasonably compensate Consultant for the value to Company of Consultant's consulting and

administrative expertise, given the all relevant facts and circumstances.

2.4 The parties acknowledge and agree that the aggregate services contracted for hereunder do not and will not exceed those that are reasonably necessary to accomplish the commercially reasonable business purposes of Company regarding the subject matter of the Statement of Work.

2.5 The parties acknowledge and agree that this Agreement sets forth the parties' understanding with respect to all of the Services that Consultant is to provide to Company during the Term hereof. The parties further acknowledge and agree that the Services to be performed by Consultant hereunder do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law.

## ARTICLE III
## TERM OF AGREEMENT

3.1 The initial term of this Agreement shall commence on the Effective Date and end on the one (1) year anniversary of the Effective Date, unless sooner terminated pursuant to the terms hereof (the "Initial Term"). Upon expiration of the Initial Term of this Agreement, this Agreement will automatically renew for additional, successive one (1) year periods (each one-year additional period a "Renewal Term")unless either party provides the other party written notice of its desire to terminate at least sixty (60) days prior to the end of the then current term. The "Initial Term" and all "Renewal Terms" are collectively referred to herein as the "Term".

3.2  This Agreement may be terminated immediately at any time by mutual consent embodied in a written agreement to terminate signed by both parties hereto.

3.3 Termination for Just Cause. Either party may terminate this Agreement immediately at any time for "just cause". The parties expressly agree that a party will have "just cause" for termination as aforesaid upon the happening of any of the following occurrences or acts: (i) Either party ceases to function as a going concern or conduct its operations in the normal course of business; (ii) The (x) suspension, liquidation or dissolution, or notice thereof, of substantially all of a party's usual business without the prior written consent of the other party hereto, (y) assignment by a party for the benefit of its creditors, or (z) filing of a voluntary or involuntary petition under the provisions of the U.S. Federal Bankruptcy Act or amendments thereto, or any application for or appointment of a receiver for the property of a party, the filing of which remains unsatisfied and discharged at the end of sixty (60) days after the occurrence of such event; (iii) Either party, without the other party's prior written consent, attempts to partially or wholly assign its rights or delegate its duties under this Agreement; (iv) Either party is prevented from substantially performing its obligations under this Agreement by any applicable law enacted or by any applicable order, rule, regulation, decree or ordinance promulgated by any appropriate governmental authority; or (v) Either party fails to comply with any of the terms of this Agreement, and fails to cure such non-compliance to the reasonable satisfaction of the non-breaching party within fifteen (15) days after receipt of reasonably detailed written notice of the breach, then the non-breaching party may immediately terminate such Agreement.

2

3.4 Upon expiration or termination of this Agreement, neither party shall have any further obligations hereunder, except for (i) obligations incurred prior to the date of expiration or termination, including, without limitation, the payment of the fee earned by Consultant prior to the termination of this Agreement, and (ii) other obligations set forth in this Agreement that specifically survive the expiration and/or earlier termination hereof.

## ARTICLE IV
### CONSULTANT'S REPRESENTATIONS AND CERTAIN OBLIGATIONS

4.1 Consultant represents and warrants to Company that: (i) all Services performed hereunder shall be performed in a good, professional, workmanlike and competent manner, in conformity with all applicable professional standards, laws and the requirements of this Agreement; (ii) the Services will conform to the attached Statement of Work; (iii) if applicable, the Consultant will take necessary steps to confirm that the deliverables of the Statement of Work will not contain or transmit to Customer any malicious code or viruses; (iv) the Services do not infringe any intellectual property rights of any third party; (v) except as required by law, Consultant will not disclose Company information to any third party for any purpose other than to provide the Service; and (vi) it will take reasonable and appropriate measures to safeguard the security, confidentiality and integrity of the Company material that it handles.

4.2 Consultant represents and warrants to Company that Consultant is not now nor shall be a party to any other agreement or under any obligation to or restriction by any third party which would prevent Consultant from entering into this Agreement or which would adversely affect this Agreement, the performance of the Services, the ability of Consultant to divulge and use knowledge and property necessary to perform the Services or any of the undertakings set forth herein in any manner.

4.3 Consultant represents and warrants to Company that Consultant has never been sanctioned by, excluded, or otherwise declared ineligible to participate in, or barred or suspended from, Medicare, Medicaid, or any other federal or state program, and has never been credibly connected with, investigated for, charged, or convicted of, a violation or offense related to health care, behavioral health, substance abuse, financial matters, or fraud of any type.

4.4 Consultant agrees to keep records and books of account for Company to the extent necessary to document the performance of the Services, which records and books of account shall be subject to audit by Company solely for the content related to Company.  Company shall, at all reasonable times, have access to all books, records, correspondence, instructions, plans, receipts, and memoranda of every description pertaining to the Services, and Consultant shall preserve such records without additional compensation therefor for a period of two (2) years after completion or termination of the Agreement. Should Company determine that unsatisfactory progress in the Statement of Work has been accomplished or in the event that this Agreement is terminated prior to completion, Company shall have access to all books, records, correspondence, instructions, receipts, and memoranda of every description of Consultant, pertaining to the Services to determine the extent of the work performed and the value received.

4.5 Company shall indemnify, defend and hold Consultant harmless for any and all claims, liabilities, damages, losses, costs, and expenses (including, without limitation, reasonable attorneys' fees and expenses), arising out of or in connection with any breach or misrepresentation by Consultant under this Agreement. The provisions of this Section shall survive the expiration or termination of this Agreement.

## ARTICLE V
## OWNERSHIP OF WORK PRODUCT

5.1 Consultant acknowledges that all work product created, developed or conceived by Consultant in the course of performing the Services during the Term, shall be solely owned by and shall be vested in Company and Consultant shall not challenge or dispute Company's ownership thereof. The parties expressly acknowledge that such work was ordered or commissioned by Company, and further agree that it shall be considered a work made for hire within the meaning of the copyright laws of the United States and that Company is entitled to patents, trademarks, copyrights and all other rights therein, throughout the world, including, but not limited to, the right to make changes therein, and such uses thereof as Company may in its sole discretion determine.

5.2 If for any reason whatsoever, any work product generated by Consultant, as a result of performing the Services hereunder, is not considered a work for hire within the meaning of the copyright laws of the United States, then Consultant hereby grants and assigns to Company, its successors and assigns, all of its right, title and interest in and to the work, including, but not limited to, the exclusive rights specified by 17 U.S.C. Section 106 as in effect and hereafter amended (and any renewal, extension or reversion of copyrights now or hereafter provided), therein, throughout the world, patents, trademarks and all other rights therein of any nature whatsoever, whether now known or hereafter devised.

5.3 Consultant shall provide Company and any entity designed by Company, at the Consultant's expense, all reasonable assistance required to perfect the rights granted to Company in this Agreement.

5.4 Consultant shall not file any trademark or patent application without Company's prior written approval.

5.5 The provisions of this Article V, OWNERSHIP OF WORK PRODUCT, shall survive the termination or expiration of this Agreement.

## ARTICLE VI
## CONFIDENTIALITY; RETURN OF DATA

6.1 Consultant shall hold confidential and shall not, directly or indirectly, disclose, publish, or use for the benefit of itself or any third party, any "Confidential Information" of Company unless expressly approved by Company. "Confidential Information" shall mean any and all information disclosed to Consultant from Company, or directly to Consultant from a customer of Company or one of its affiliates, relating to the business of Company, including but not limited to, all sales and operating information, existing and potential business and marketing plans and strategies, financial information, cost and pricing information,

4

customer and potential customer identities and other information, prospect lists, referral sources, customer lists and customer information, information concerning services and supplies, consulting programs, computer program and systems, business and supplier contracts, techniques, processes, methods, technologies, business information, financial data, financial plans, products, information regarding equipment, personnel, tests, pricing policies, arrangements, business plans or business strategies, concepts, proposed products, prototypes, reports, operations, and the like, whether or not the foregoing information is patented, tested, reduced to practice, or subject to copyright. The term "Confidential Information" does not include information which (i) becomes generally available to the public other than as a result of disclosure by Consultant in breach of this Agreement, (ii) was available to Consultant on a non-confidential basis as shown in written records prior to its disclosure to Consultant by Company or (iii) becomes available to Consultant on a non-confidential basis from a source other than Company; provided that such source is not bound by a confidentiality agreement with Company or is otherwise prohibited from transferring the information to Consultant by a contractual, legal or fiduciary obligation. Consultant recognizes that Company, which would be irreparably injured by reason of any unauthorized use or disclosure of Confidential Information, shall have a direct right of action against Consultant for any such unauthorized use or disclosure.

6.2 In the event that Consultant is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, it is agreed that Consultant will provide Company with prompt notice of such request(s) so that Company may seek an appropriate protective order or other appropriate remedy and/or waive compliance with the confidentiality provisions of this Agreement.

6.3 Consultant shall not use any Confidential Information in any way or for any purpose other than for the purpose of fulfilling the terms and obligations of this Agreement.

6.4 Consultant shall not use any Confidential Information for personal benefit or for the benefit of any other person or entity.

6.5 Consultant shall use commercially reasonable efforts to maintain the secrecy and confidentiality of Confidential Information and ensure that Confidential Information is not disclosed by any person, in whole or in part, contrary to any of the terms of this Agreement.

6.6 Except for disclosure to a party's legal counsel, accountants or financial advisors, neither party shall disclose the terms of this Agreement to any person who is not a party or signatory, unless disclosure thereof is required by law, decrees of a court, or otherwise authorized by this Agreement or consented to in writing by the other party. Unauthorized disclosure of the terms of this Agreement shall be a material breach of this Agreement and shall provide the non-disclosing party with the option of pursuing remedies for breach or termination of this Agreement.

6.7 Promptly following the written request of Company, Consultant will deliver to Company all documents or other matter furnished by Company to Consultant constituting Confidential Information, together with all copies thereof. In the event of such request, all other documents or other matter

5

constituting Confidential Information, together with all copies thereof in the possession of Consultant, will be destroyed with any such destruction confirmed by Consultant in writing to Company.

6.8 The provisions of this Article VI, CONFIDENTIALITY; RETURN OF DATA, shall survive the termination or expiration of this Agreement.

## ARTICLE VII
## INDEPENDENT CONTRACTOR; NON-SOLICITATION

7.1 Consultant is retained by Company solely for the purposes and to the extent set forth in this Agreement, and Consultant's relationship to Company shall, during the period of Consultant's rendering of the Services hereunder, be that of an independent contractor. Consultant shall be solely responsible for the withholding and payment of all taxes incurred in connection with the subject matter of this Agreement, including but not limited to (i) all applicable U.S. federal, state and local and foreign income taxes and (ii) all employment-related taxes, including, but not limited to, Social Security, unemployment, Medicare, Medicaid, disability and similar taxes or charges.  Consultant agrees to indemnify and hold harmless the Company against all claims, taxes, penalties, interest, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) which may be assessed against, or incurred by, Company under any law, rule or regulation now in effect or hereafter enacted, with respect to Consultant. The provisions of this Section 7.1 shall survive the termination or expiration of this Agreement.

7.2. Commencing on the Effective Date and continuing for a period of one (1) year following the termination of the Agreement with the Company, neither party shall not, directly or indirectly, (i) solicit the business of any person who is a direct or indirect customer, vendor or partner of either party with whom the other party had personal contact, or (ii) cause, induce or attempt to cause or induce any such customer or client, patient, vendor, supplier, or other business relation of either party with whom the other party had personal contact with the other party to cease doing business with, or reduce the amount of business done with, the other party.

7.3 Non-Circumvent. Neither party will try to circumvent the other for any purpose. The Company agrees to not reimburse or compensate any other sales agent, company, or representative for sales to any account registered with the Consultant and/or the Consultant's associates while the parties during the Term of this Agreement and continuing for a period of one (1) year following the termination of the Agreement.

## ARTICLE VIII
## COMPLIANCE WITH LEGAL REQUIREMENTS

8.1 The parties hereto enter into this Agreement with the intent of conducting their relationship in full compliance with applicable state, local and Federal law, including, but not limited to, the Healthcare Laws (as defined below). Notwithstanding any unanticipated effect of any of the provisions of this Agreement, no party shall intentionally conduct itself under the terms of this Agreement in a manner that would constitute a violation of the Healthcare Laws. The parties will perform their respective obligations under

6

this Agreement in accordance with the terms hereof. Any agreements between the parties will be in writing, and the parties will perform their respective obligations under such agreement only in accordance with the terms thereof.

For purposes of this Agreement, the term "Healthcare Laws" means applicable provisions of the Federal Social Security Act (including but not limited to the Medicare and Medicaid Anti-Fraud and Abuse Amendments (42 U.S.C. § 1320a-7a and -7b), the Patient Protection and Affordable Care Act (Pub. L. No. 111-148, 124 Stat. 119 (2010)), the Federal Patient Anti-Self Referral Law (42 U.S.C. § 1395nn)), any and all other applicable state statutes and laws, and any regulations promulgated thereunder, as these laws may now exist or hereafter may be amended.

8.2 In the event that subsequent to the date of this Agreement (i) the contents or validity of this Agreement are challenged by any governmental authority under applicable law, particularly a Healthcare Law, or (ii) either party determines, based upon advice received from legal counsel, that a violation of a law, particularly a Healthcare Law, has occurred as a result of this Agreement or that a violation of a law, particularly a Healthcare Law, will occur as a result of this Agreement, then such party shall promptly notify the other party with respect thereto. The parties shall promptly use reasonable efforts to analyze, revise, reform and, to the extent necessary, restructure this Agreement and the relationship among the parties in order to fully comply with applicable law in a manner that is equitable to each party.

8.3 In the event the parties are unable to formulate a mutually acceptable plan to revise, reform and restructure this Agreement in order to fully comply with all applicable laws within twenty (20) days after the parties initiate negotiations with respect to such plan, then this Agreement shall automatically terminate.

## ARTICLE IX
### NOTICES

9.1 Any notice required or permitted to be given hereunder shall be in writing and shall be (A) (i) delivered personally by hand, (ii) sent by registered or certified mail, return receipt requested, or (iii) sent by a recognized qualified overnight delivery service (e.g., Federal Express), AND (B) delivered via email. All such notices shall be sent to the addresses of each party set forth below or to such other address or addresses as shall be designated in writing in the same manner:

To Company:
To the address first above written, ATTN: Legal, and via email to jgrossi@helixmdx.com

To Consultant:
To the address first above written, ATTN: Alex Meshkin, and via email to: alex@flowhealth.com

All notices shall be deemed to have been given within three (3) days of being sent or when earlier received.

7

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

10.1 This Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and performed wholly within the State of California, and without regard to its conflict of law principles.

10.2 The parties shall endeavor to resolve any differences of opinion which may arise between them with respect to the provisions of this Agreement by negotiation between the parties personally or with the assistance of the parties' respective attorneys and neither party shall commence any public proceedings until such negotiations have failed to produce a resolution; at a minimum, the parties shall attempt to negotiate and resolve the matter for a minimum of ten (10) days. Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by arbitration in Los Angeles, CA, before one (1) arbitrator who shall be a retired judge admitted to practice law in the State of California. The arbitration shall be administered by JAMS (or any like organization successor thereto) pursuant to its Streamlined Arbitration Rules and Procedures. The arbitrator shall follow any applicable federal law and California state law in rendering an award. The non-prevailing party in any dispute under this Agreement shall pay all costs and expenses, including expert witness fees and attorneys' fees, incurred by the prevailing party in resolving such dispute. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The parties further understand and agree that the arbitrator's decision shall be final and binding to the fullest extent permitted by law and enforceable by any court having jurisdiction thereof.

10.3  This Agreement may not be and shall not be deemed or construed to have been modified, amended, rescinded or canceled in whole or in part, except by written instrument signed by the parties hereto which makes specific reference to this Agreement and which specifies that this Agreement is being modified, amended, rescinded or canceled.

10.4 If any provision of this Agreement shall be declared invalid or illegal for any reason whatsoever, then notwithstanding such invalidity or illegality, the remaining terms and provisions of this Agreement shall remain in full force and effect in the same manner as if the invalid or illegal provision had not been contained herein.

10.5 No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or future exercise thereof or the exercise of any other right or remedy granted hereby, or by any related document, or by law. Any failure of a party to comply with any obligation contained in this Agreement may be waived by the party entitled to the benefit thereof only by a written instrument duly executed and delivered by the party granting such waiver, which instrument makes specific reference to this Agreement and the provision to which it relates and describes the right or obligation consented to, waived or purported to be violated.

8

10.6 This Agreement contains the entire agreement and understanding between the parties hereto in reference to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express or implied, verbal or written, between the parties other than as expressly set forth in this Agreement. Consultant unconditionally and irrevocably waives any and all rights or claims to any other fee, compensation, or benefit whatsoever from Company and its affiliates. No extraneous communications have been relied upon by either party in entering into this Agreement. If any of the provisions of the Statement of Work attached hereto as Schedule A are inconsistent with the provisions of this Agreement, the provisions of this Agreement shall govern, unless otherwise specifically provided in Schedule A.

10.7 Consultant has no authority to enter into contracts or agreements on behalf of Company or any of its predecessor, parent, subsidiary or affiliated companies.

10.8 Consultant shall not, without the written consent of Company, assign or transfer this Agreement, whether by operation of law or otherwise. Company may assign or transfer this Agreement to an affiliate and shall give Consultant notice of any such assignment.

10.9 This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties acknowledge and agree that signatures transmitted by facsimile or other electronic means shall have the same effect as original signatures.

*[Remainder of page intentionally left blank. Signatures appear on following page.]*

9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives effective as of the date and year first above written.

**COMPANY:**

**ARK LABORATORY LLC**

By: _____
       James Grossi, CEO

**CONSULTANT:**

**SIGNAL GENOMICS LLC**

By: _____
       Alex Meshkin, Manager

10

**Schedule A**
**STATEMENT OF WORK**

**SERVICES**

Consultant shall perform the following services:

1.      Education of Prospective Customers:  Consultant will use reasonable efforts to educate prospective customers, as to (i) how to incorporate the use of the services into their respective practices, (ii) the benefits of utilizing the services.

2.      Account Management:  Consultant will assist Company in establishing an account for all new customers generated by Consultant and provide support to Company in maintaining accurate and up to date accounts for all customers generated by Consultant, including ensuring that Company has correct and complete information with respect to each such customer.

3.      Operational Assistance:  Consultant will provide assistance to Company in properly managing each customer generated by Consultant, including performing certain day-to-day logistical oversight support with respect to monitoring and/or tracking specimens.

4.      Customer Complaints: Consultant will promptly report to Company any complaints about the Marketplace from customers in the Territory and, at the Company's request, will investigate and report to Company about any such complaints.

5.      Alteration: Consultant will not alter or modify any of the literature or packaging with respect to any services or Company without Company's prior written consent.

6.      Records: Consultant will maintain appropriate records regarding Consultant's sale of any service. Consultant will permit Company reasonable access to such records upon prior written notice to Consultant.

7.      Warranties: Consultant will not make any warranty or representation about the Company or the use or efficacy of any of the services, except those written warranties, representations, and statements concerning use or efficacy of a particular service as Company may provide to Consultant from time to time for delivery to or use with customers or potential customers in the Territory.

8.      Expenses: Consultant will pay when due all costs, expenses, taxes and liabilities that Consultant incurs in connection with Consultant's performance under this Agreement.

9.      Other Services: Consultant will perform such other consulting services as the parties shall from time to time mutually agree.

11

**FEE**

Company shall pay Consultant a fee, for each week during the term hereof, in an amount equal to Twelve Thousand Dollars ($12,000). The fee is payable in weekly installments, in arrears for the prior week during the term hereof.

EXHIBIT "C"

# Signal Diagnostics
# Laboratory Services Agreement

This Laboratory Services Agreement, (the "Agreement") is effective as of the _____ day of _____, 2019, by and between Signal Diagnostics, Delaware Limited Liability Corporation, with a business address at 8885 Venice Blvd Los Angeles CA 90034 hereinafter referred to as LAB and Ark Laboratories LLC d/b/a Helix Diagnostics ("CLIENT") with a business address at 6620 Highland Rd, Waterford Twp, MI 48327.

Whereas, LAB has the facilities and expertise to provide blood, allergy and molecular diagnostics testing services to physicians, hospitals and laboratories, and

Whereas, CLIENT is a physician, group of physicians, hospital or laboratory that desires to purchase certain laboratory services from LAB.

Therefore, LAB and CLIENT do hereby agree as follows:

**A.     Responsibilities of the Parties**

1. Laboratory Testing Services. LAB agrees to provide to CLIENT the laboratory testing services described in Exhibit A attached hereto.

2. Specimens. CLIENT will provide LAB with certain specimens for lab testing. LAB has developed specific specimen requirements, which are attached hereto as Exhibit B. CLIENT agrees to follow all instructions on Exhibit B and understands that such instructions are critical to LAB's ability to perform the tests described herein. All costs associated with CLIENT's failure to follow the instructions described on Exhibit B shall be CLIENT's responsibility.

3. Transport. All specimens should be shipped in the manner specified in Exhibit B to the following address:

> Signal Diagnostics
> 8885 Venice Blvd
> Suite 105
> Los Angeles, CA 90034

4. Price. For the provision of such laboratory testing services, LAB will bill CLIENT monthly, and CLIENT agrees to reimburse LAB at the rate set forth in Exhibit A as the current fees to be charged to CLIENT for services rendered hereunder. No tests or services will be priced below the fair market value as required by law.

Any amendments or changes to the scheduled fees, Exhibit A, shall be effective thirty (30) days following the date upon which LAB has notified CLIENT in writing, at which time the amended schedule will become part of this Agreement.

MGL Lab Services

5. <u>Invoices.</u> LAB will submit an invoice monthly to CLIENT. CLIENT agrees to pay such invoice within 15 days after receipt thereof. Payment shall be made by wire transfer, automated clearing house payment or credit card. If payment is made by credit card, a three percent (3%) fee will be added. In the event of late payments, the LAB may charge the CLIENT a five percent (5%) late fee. In addition, any late payment will accrue interest at the rate of 1.5% per month (18% per annum) or the maximum amount allowed by law, if less. Invoices shall be sent to the address below and be sent either electronically, via facsimile or US post. If CLIENT requires an original invoice such invoice will be sent via courier at CLIENT's expense.

_____ Telephone No.
Facsimile No.
E-Mail

All questions regarding invoices should be directed to the LAB's Institutional Billing Manager at 855.551.3789 or billing@flowhealth.com, or such other person designated in writing by LAB.

6. <u>Confidentiality.</u> CLIENT acknowledges and agrees that the terms of this Agreement are confidential. CLIENT agrees that neither CLIENT nor CLIENT's agents or employees shall disclose, by any means, the terms of this Agreement, including, but not limited to, the price schedule or any part thereof, to any party not a party to this Agreement. In the event CLIENT breaches this confidentiality provision, LAB shall have the right, in its sole discretion, to increase the prices charged for the services to be performed hereunder by amending Exhibit A. LAB may use aggregated and/or de-identified data related to the operation of CLIENT and LAB services hereunder for quality improvement and research and development and marketing purposes by LAB.

HIPAA Requirements. Both parties agree to comply with the applicable provisions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. §1320d through d-8, as amended from time to time ("HIPAA"), and the requirements of any regulations promulgated thereunder including, without limitation, the federal privacy regulations as contained in 45 CFR Part 164 (the "Federal Privacy Regulations") and the federal security standards as contained in 45 CFR Part 142 (the "Federal Security Regulations"). Both parties acknowledge that each party constitutes a "covered entity," as that term is defined at 45 CFR §164.103, and both parties are engaged in "covered functions," as that term is defined at 45 CFR §164.501. Both parties agree not to use or further disclose any "protected health information," as defined at 45 CFR §164.504, or "individually identifiable health information," as defined at 42 U.S.C. §1320d (collectively, the "Protected Health Information"), concerning a patient other than as permitted by the provisions of this Agreement and the requirements of HIPAA and the regulations promulgated pursuant to

2

HIPAA, including without limitation the Federal Privacy Regulations and the Federal Security Regulations. Both parties shall implement appropriate safeguards to prevent the use or disclosure of protected health information other than as provided for by this Agreement. Either party shall promptly report to the other party any use or disclosure of protected health information not in accordance with this Agreement or in violation of HIPAA, the Federal Privacy Regulations, or the Federal Security Regulations of which that party becomes aware. In the event either party, with the prior approval of the other party in writing, contracts with any other parties or agents to whom the party furnishes protected health information received from the party, that party shall include provisions in such agreements whereby that party and the other party or agent agree to the same restrictions and conditions that apply to that party with respect to such protected health information. Either party shall return to the other party or properly dispose of any protected health information in accordance with federal and state law and regulations after the expiration or termination of this Agreement. Either party shall make its internal practices, books, and records relating to the use and disclosure of protected health information available to the Secretary of Health and Human Services to the extent required for determining compliance with the Federal Privacy Regulations and the Federal Security Regulations. Notwithstanding the foregoing, no attorney-client, accountant-client, or other legal privilege shall be deemed waived by either party by virtue of this paragraph. Any breach of this paragraph shall constitute a material breach upon which termination of this Agreement may be based.

7. **Insurance.** CLIENT shall, at its sole cost and expense at all time during the term of this Agreement, procure and maintain comprehensive general and professional liability insurance or self-insurance (including personal injury, property damage, products liability, and completed operations liability), in a minimum amount of One Million Dollars ($1,000,000). CLIENT shall cause to be issued to LAB proper certificates of insurance or self-insurance evidencing the foregoing provisions of this Agreement have been complied with and said certificates shall provide that prior to any cancellation or change in the underlying insurance during the policy period, the insurance carrier will first give thirty (30) calendar days written notice to LAB.

LAB shall, at its sole cost and expense and at all times during the term of the Agreement, procure and maintain professional liability self-insurance (including personal injury, property damage, products liability) in a minimum amount of One Million Dollars ($1,000,000). LAB shall cause to be issued to CLIENT proper certificates of self-insurance evidencing the foregoing provisions of this Agreement have been complied with and said certificates shall provide that prior to any cancellation or change in the underlying insurance during the policy period, the insurance carrier will first give thirty (30) calendar days written notice to CLIENT.

B. **General Provisions**

3

1. <u>Term</u>. The initial term of this Agreement shall commence as of the date recited above and continue for one year.  Thereafter, this Agreement shall automatically renew for additional one-year terms unless either party gives written notice of termination to the other party. Such termination is effective 30 days after receipt of written notice sent by the terminating party.  This Agreement may be terminated without cause at any time before expiration with thirty (30) days written notice by the terminating party. LAB may terminate this Agreement immediately upon CLIENT's failure to pay according to Section A.5 herein.

2. <u>Effect of Termination.</u>  Upon termination of this Agreement for any reason LAB shall invoice CLIENT for any partial or full month(s) remaining and CLIENT agrees to pay LAB final payment(s) within 15 days as invoiced.  In addition, upon any termination, LAB may at its sole discretion, provide laboratory testing services for any specimens received but not processed as of the date of termination, or return such specimens to CLIENT.  LAB may consider but not be obligated to provide laboratory testing services under such circumstances upon offer of prepayment for the laboratory testing services by CLIENT.

3. <u>Assignment</u>. This Agreement may not be assigned by either party without the prior written consent of the other party.  Consent may be conditioned upon written acknowledgment of obligations under this Agreement by the prospective recipient of the assignment.

4. <u>Amendments</u>. This Agreement may be modified or amended only by an instrument in writing signed by both parties hereto.

5. <u>Force Majeure.</u>  No liability hereunder shall result to a party by reason of delay in performance caused by force majeure, that is circumstances beyond the reasonable control of the party, including, without limitation, acts of God, fire, flood, war, terrorism, civil unrest, labor unrest, or shortage of or inability to obtain material or equipment.

6. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior negotiations, correspondence, understandings and agreements between CLIENT and LAB.

7. <u>Independent Contractors</u>. LAB and CLIENT are independent contractors, and nothing in this Agreement shall be deemed or construed to create an employment or agency relationship between LAB and CLIENT.

8. <u>Non-Waiver</u>.  The parties covenant and agree that if a party fails or neglects for any reason to take advantage of any of the terms provided for the termination of this Agreement or if a party, having the right to declare this Agreement terminated, shall fail to do so, any such failure or neglect by such party shall not be a waiver or be deemed or be construed to be a waiver of any cause for the termination of this Agreement subsequently arising, or as a waiver of any of the terms, covenants or

4

conditions of this Agreement or of the performance thereof. None of the terms, covenants and conditions of this Agreement may be waived by a party except by its written consent.

9. <u>Reformation.</u>  The parties hereby agree that neither party intends to violate any public policy, statutory or common law, rule, regulation, treaty or decision of any government agency or executive body thereof of any country or community or association of countries, and that if any word, sentence, paragraph or clause or combination thereof of this Agreement is found, by a court or executive body with judicial powers having jurisdiction over this Agreement or any of the parties hereto, in a final, unappealable order to be in violation of any such provision in any country or community or association of countries, such words, sentences, paragraphs or clauses or combination shall be inoperative in such country or community or association of countries, and the remainder of this Agreement shall remain binding upon the parties hereto. In lieu of such inoperative words, sentences, paragraphs or clauses, or combination of clauses, there will be added automatically as part of this Agreement, a valid, enforceable and operative provision as close to the original language as may be possible which preserves the economic benefits to the parties.

10. <u>Governing Law</u>. This Agreement shall be construed, interpreted and governed by the laws of the State of California and venue for any and all claims or actions arising out of or relating to this Agreement shall be the district courts of Los Angeles County, California.  The non-prevailing party in any dispute under this Agreement shall pay all costs and expenses, including expert witness fees and attorneys' fees, incurred by the prevailing party in resolving such dispute.

11. <u>Indemnification</u>. Each party shall protect, indemnify and hold the other party harmless from and against any and all liability and expense of any kind, arising from injuries or damages to persons or property in connection with the provision of services or any patient interaction by the indemnifying party hereunder.

12. <u>Non-Solicitation.</u>  During the term of this Agreement and for twelve (12) months after any termination of this Agreement, neither Party will, without the prior written consent of the other Party, either directly or indirectly solicit or attempt to solicit, divert or hire away any person from either Party.

13. <u>Notices</u>. All notices (except invoices which will be sent per Section A.5) under this Agreement shall be in writing and delivered either by personal delivery or mailed by United States mail, postage prepaid, to the following addresses:

        If to LAB:

        Signal Diagnostics c/o Flow Health
        8885 Venice Blvd
        Los Angeles CA 90034
        ATTN: Legal

If to CLIENT:

*Remainder of page intentionally left blank. Signatures appear on the following page.*

6

In Witness Whereof, the parties have executed this Agreement as of date indicated above.

SIGNAL DIAGNOSTICS

_____
Signature

<u>Alex Meshkin</u>
Name

<u>CEO</u>
Title

CLIENT:

_____
Signature

_____
Name

<u>CEO</u>
Title

7

Exhibit A
LABORATORY TESTING SERVICES & PRICES

| TEST | DESCRIPTION | PRICE | TAT |
|------|-------------|-------|-----|
| RPP | Biofire RP2 | $250 | 24-28 hrs |
|  |  |  |  |
|  |  |  |  |

**Any other test will be billed at 70% of CMS Fee Schedule

Exhibit B
SPECIMEN REQUIREMENTS

| TEST | SPECIMEN | STABILITY |
|---|---|---|
| Allergen360 Environmental | 1 SST | 7 DAYS REFRIGERATED 30 DAYS FROZEN |
| Allergen360 Dietary | 1 SST | 7 DAYS REFRIGERATED 30 DAYS FROZEN |
| COVID-19 RT-PCR | COVID-19 RT-PCR | 3 DAYS REFRIGERATED 30 DAYS FROZEN |

DOWNEY BRAND LLP

1                          **<u>CERTIFICATE OF SERVICE</u>**

2          I, Linda Cortez, hereby certify that on this 1st day of October, 2020, a copy of

3  the foregoing **DEFENDANT ARK LABORATORY, LLC dba HELIX**

4  **DIAGNOSTICS' NOTICE OF REMOVAL UNDER 28 U.S.C. §§ 1332,1367**

5  was served via U.S. Mail, on the following:

6         David W. Kani

7         Hochfelsen Kani, LLP
           895 Dove Street, Suite 300

8         Newport Beach, CA 92660

9         *Counsel for Plaintiffs*

10

11

12                                Linda Cortez

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28